**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

_____

IN RE: AUTOMOTIVE PARTS
ANTITRUST LITIGATION                                   MASTER FILE NO. 12-md-02311

_____

In Re: Wire Harness Cases                              HON. MARIANNE O. BATTANI

_____

THIS DOCUMENT RELATES TO:

All Cases                                                         2:12-cv-00100

_____/

**OPINION AND ORDER DENYING LEAR CORPORATION'S**
**RULE 12(b)(6) MOTION TO DISMISS**

Before the Court is Defendant Lear Corporation's Rule 12(b)(6) Motion to

Dismiss (Case No. 12-02311, Doc. No. 237) all claims advanced against it in the Direct

Purchasers Plaintiffs' ("DPPs") Consolidated Amended Class Action Complaint (Doc.

No. 86), the Automobile Dealer Plaintiffs' ("ADPs") Consolidated Class Action

Complaint (Doc. No. 85), and the End-Payor Plaintiffs' ("EPPs") Corrected Consolidated

Amended Class Action Complaint (Doc. No. 174).  The Court heard oral argument on

December 5, 2012, and at the conclusion of the hearing, took this matter under

advisement.  For the reasons that follow, the Court **DENIES** the motion.

## I.  INTRODUCTION AND FACTUAL BACKGROUND

Lear Corporation ("Lear") sells automotive wire harness systems to original equipment manufactures (OEMs) which sell completed vehicles to Automobile Dealers, who then sell to End-Payor consumers.  In the complaints, Plaintiffs allege that wire harness suppliers conspired to rig bids and fix prices of wire harness systems.

Lear filed for bankruptcy protection on July 7, 2009, and it emerged from bankruptcy on November 9, 2009.  (Doc. No. 85 at ¶ 101).  On February 12, 2012, the Bankruptcy Court for the Southern District of New York enjoined Plaintiffs' claims against Lear to the extent they arise out of conduct that predated Lear's November 2009 bankruptcy.  (Doc. No. 237, Ex. B).  The bankruptcy court reached a different conclusion relative to post-discharge conduct.

> The nature and extent of Lear's conduct after the Effective Date of the Plan in violation of the antitrust laws if any, and its effect are issues that can and should be decided by the antitrust court in connection with the prosecution of a consolidated amended complaint.  They involve intensely factual inquiries and are not susceptible to determination on the existing record.  If antitrust law imposes joint and several damages on a conspirator for prior harm caused by his co-conspirators, it is premature for Lear to contend it is entitled to an injunction barring lawsuits alleging liability for claims based on post-Effective Date conduct.  Bankruptcy policy affords debtors a fresh start, but a debtor is responsible for the consequences of its actions after it emerges from chapter 11, and if bankruptcy law discharges a liability, but the debtor takes new action and incurs a similar liability after receiving its discharge there may be no entitlement to an injunction against prosecution later.

(Doc. No. 237, Ex. B).

In the complaints, DPPs, ADPs, and EPPs allege that Lear "continued to sell" wire harnesses at "supra-competitive prices" post discharge. For example, Direct Purchaser Plaintiffs allege:

2

> After its emergence from Chapter 11 bankruptcy proceedings on November 9, 2009, Lear continued to sell Wire Harness Products pursuant to and as part of its participation in furtherance of the conspiracy.  From and after November 2009, Lear had significant Wire Harness Products sales in the United States at supra-competitive prices. In 2010 alone, Lear had $2.56 billion in total sales in the electric power and management systems, which includes significant sales of Wire Harness Products in the United States pursuant to the conspiracy.

(Doc No. 86 at ¶ 42).  (See also Doc. No. 85 at ¶ 101; Doc. No. 174 at ¶ 96).

In addition to Lear's conduct, DPPs advance allegations based upon Lear's involvement in a joint venture with another Defendant.

> During the Class Period, Furukawa Wiring Systems America, Inc. (Furukawa Wiring) operated as a joint venture between Lear Corporation and Furukawa Electric Co. Ltd., that manufactured, distributed, or sold Wire Harness Products that were purchased throughout [the] United States. . . .

(Doc. No. 86 at ¶ 37).  According to the ADPs,

> Furukawa Wiring Systems, America, Inc., operating under the names, Furukawa Lear Corporation and Lear Furukawa Corporation, was a joint venture, between Furukawa Electric and Lear Corporation.  In 1987, Furukawa Electric and a Lear Corporation corporate predecessor began Furukawa Wiring as a joint venture to manufacture and sell wire harnesses to Japanese automobile manufacturers in North America.  Lear held an 80% stake in the venture, with Furukawa holding the remaining 20%.  In April 2009, Furukawa purchased an additional 60% of the joint venture, raising its stake to 80%, and changed the joint venture's name to Furukawa Lear Corporation.  In June 2010, Furukawa Lear Corporation became a wholly owned subsidiary of Furukawa called Furukawa Wiring.

(Doc. No. 85 at ¶ 96).  The EPPs also allege that during the class period, Furukawa Wiring operated as a joint venture between Lear and Furukawa Electric.  (Doc. No. 174 at ¶ 91).  In June 2010, six months after Lear's discharge in bankruptcy, it sold its remaining interest in Furukawa Wiring.  (Id.)

In February 2010, the Competition Directorate of the European Commission

3

raided the offices of Wire Harness Products manufacturers and announced an "investigation" into electric components suppliers who were suspected of violating EU antitrust rules.  (Doc. No. 85 at ¶ 117).  Lear Automotive France, a Lear subsidiary was included in the investigation.  (Id.)

The Department of Justice subsequently charged Furukawa Electric and three of its executives with antitrust violations, and in November 2011, Furukawa Electric pleaded guilty to criminal price-fixing and bid-rigging in connection to the sale of Wire Harness Products.  (Id. at ¶ 132).  These allegations are part of the building blocks of Plaintiffs' antitrust claims against Lear.

In addition to joining the Collective Defendants' motions to dismiss the complaints, Lear Corporation ("Lear") filed an individual motion asking the Court to dismiss it from the complaints in this wire harness antitrust litigation for failure to state a claim.  Lear maintains that DPPs, ADPs, and EPPs have failed to allege plausible claims for relief because the allegations do not support even an inference that Lear knew of or joined the alleged conspiracy or committed any overt act in furtherance of the conspiracy.  In addition, Lear challenges the viability of the complaints in light of the bankruptcy proceedings in which all claims that arose prior to November 9, 2009, have been discharged in bankruptcy.

## II.  STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) allows district courts to dismiss a complaint which fails "to state a claim upon which relief can be granted."  To survive a motion to dismiss for failure to state a claim under Rule 12(b)(6), the plaintiff must show that his complaint alleges facts which, if proven, would entitle him to relief.  First Am.

4

Title Co. v. DeVaugh, 480 F.3d 438, 443 (6th Cir. 2007).  "A complaint must contain either direct or inferential allegations with respect to all material elements necessary to sustain a recovery under some viable legal theory."  Weiner v. Klais & Co., 108 F.3d 86, 88 (6th Cir. 1997).

When reviewing a motion to dismiss,  the Court "must construe the complaint in the light most favorable to the plaintiff, accept all factual allegations as true, and determine whether the complaint contains enough facts to state a claim to relief that is plausible on its face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  Although the federal procedural rules do not require that the facts alleged in the complaint be detailed, "'a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do.' " Twombly, 550 U.S. at 555; Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").

In Twombly, the Supreme Court considered the pleading requirements needed to withstand a motion to dismiss relative to a Section 1 Sherman Act claim.  It held that the complaint must contain enough factual matter to "plausibly suggest" an agreement:

> Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of illegal agreement. And, of course, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely.

550 U.S. at 556.

5

## III.  ANALYSIS

### A. Sufficiency of the Allegations

Lear challenges the absence of specific allegations against it.  In particular, Lear notes that there are no factual allegations suggesting that it knew of or joined a conspiracy to engage in anticompetitive acts; that the Department of Justice has not named Lear as a target; or that the Department of Justice raided Lear's office.  Lear concludes that it is named only because it happens to be in the same industry as those Defendants that entered guilty pleas.

The sufficiency of the complaints do not turn on whether Lear is a named target. DPPs, ADPs, and EPPs allege Lear was involved in the conspiracy.  Although the complaints do not allege that Furukawa was Lear's partner in the joint venture, they do allege that Furukawa had an ownership relationship with Lear relative to their joint venture, and Furukawa has pleaded guilty to price-fixing and bid-rigging relative to the same products manufactured, distributed, and sold by Lear.  Without question, a wire harness systems conspiracy existed as evidenced by numerous guilty pleas.  Plaintiffs allege that Lear participated in the very same conspiracy.  Lear had significant sales of wire harness systems--5% of the market.  Given these allegations, the Court rejects Lear's characterization of its involvement in this litigation as merely guilt by association. The fact that an antitrust conspiracy in the wire harness market existed when coupled with the type of market conditions that facilitate anticompetitive conduct, Lear's market share, and its association with Furukawa, when considered in total, raise a reasonable expectation that discovery will reveal additional evidence of illegal agreements relative

6

to Lear.  These allegations satisfy <u>Twombly</u>.

### B.  Impact of Lear's Discharge in Bankruptcy

The Bankruptcy Court confirmed Lear's plan of reorganization effective November 9, 2009, and the confirmation discharged Lear from debt that arose before the date of the confirmation.  <u>See</u> 11 U.S.C. § 1141(d)(1).  Moreover, "a discharge in bankruptcy serves as an injunction against actions to collect on the debtor's personal liabilities."  <u>In re Federated Dept. Stores</u>, 328 F.3d 829, 832 (6th Cir. 2003); 11 U.S.C. § 524(a)(2).

Nevertheless, a successfully reorganized debtor under Chapter 11 of the Bankruptcy Code is liable for any independent conduct that arises after the confirmation of its bankruptcy plan.  <u>In re Travel Agent Comm'n Antitrust Litig.</u>, 583 F.3d 896, 902 (6th Cir. 2009) (citing <u>In re WorldCom, Inc.</u>, 546 F.3d 211, 221 (2d Cir. 2008); <u>O'Loghlin v. County of Orange</u>, 229 F.3d 871, 875 (9th Cir. 2000)).  Although a debtor "gets a fresh start," a debtor does not "get a free pass to continue violating the law."  <u>In re Travel Agent</u>, 583 F.3d at 902.  The parties dispute whether Lear engaged in conduct after the confirmation giving rise to antitrust claims.  The district court in New York left resolution of that dispute to this Court.  Notably, after it reviewed the bankruptcy court's order, the New York district court issued an opinion analyzing whether "Lear's alleged post-Effective Date conduct. . .could potentially subject Lear to liability for acts committed both before and after the Effective Date."  <u>In re Lear Corp.</u>, 12 CIV. 2626 KBF, 2012 WL 5438929 (S. D. N. Y. Nov. 5, 2012) (citations omitted).  The district court noted:

> This potential for joint and several co-conspirator liability requires the Court to break Lear's alleged post-Effective Date conduct into two "buckets": (1) conduct that may result in post-Effective Date damages (e.g., damages measured prospectively from the date of the alleged conduct only, and which occur after the Effective Date); and (2) conduct that might, in the absence of a bankruptcy discharge, result in liability for pre-Effective Date damages--whether it be damages for Lear's own conduct or the conduct of alleged co-conspirators. The first bucket involves questions properly left to the MDL court. This Court does not remand questions relating to that bucket for further determination.

Id.

In their respective complaints, the plaintiff classes all allege that Lear sold significant numbers of price-fixed products after its discharge date of November 9, 2009.  Lear contends that in this case any claim against it is barred because there is no new injury to Plaintiffs post-confirmation.  According to Lear, the relevant predicate act in bid-rigging is submitting the anticompetitive bid itself; subsequent payments received do not constitute separate relevant acts giving rise to a continuing violation. Therefore, Lear concludes that it engaged in no overt conduct after the discharge, and post-November 2009 conduct does not support antitrust liability.

To support its position that the claims against it cannot proceed, Lear relies on In re Travel Agent, 583 F.3d 896, a case in which the plaintiffs, a group of travel agencies, alleged that the defendant, United Airlines and other airlines conspired to cap, cut, and eliminate base commissions with the intention of driving the plaintiffs out of business. Id. at 900.  After each defendant had eliminated base commissions, United Airlines filed for bankruptcy.  Id.  The plaintiffs alleged that United Airlines rejoined the conspiracy after it emerged from bankruptcy when it maintained the 0% base commission policy and failed to pay commissions.  The district court disagreed, and granted United

Airline's motion to dismiss, holding that United Airline's continued 0% commission policy did not create a new Sherman Act claim because its decision "was merely a reaffirmation of a previous act."  Id. at 902.  The appellate court agreed that United Airline's inaction in adhering to its preexisting policy was not an overt act sufficient to create new antitrust liability.

> We reject plaintiffs' attempt to characterize United's decision to maintain its 0% commission policy as an overt act. Since the Supreme Court decided Zenith Radio [Corp. v. Hazeltine Research, Inc., 401 U.S. 321 (1971), courts have uniformly defined a continuing antitrust violation as one in which the plaintiff's interests are repeatedly invaded. Peck [v. General Motors], 894 F.2d 844, at 849 [(6th Cir. 1990) (quoting Pace Indus., Inc. v. Three Phoenix Co., 813 F.2d 234, 237 (9th Cir.1987) (internal quotation marks and alterations omitted)). **Although United's participation in the alleged conspiracy would certainly create a rippling effect, plaintiffs assert that United's final act to effectuate that conspiracy occurred in 2002, long before United emerged from bankruptcy.** We also cannot ignore the consequence of concluding that an overt act occurred under these facts. If we were to adopt plaintiffs' continuing violation theory, the applicable limitations period for a § 1 claim would be infinite-an antitrust plaintiff could routinely salvage an otherwise untimely claim by asserting that it continues to lose revenue because of past alleged anticompetitive conduct. We therefore hold that the district court properly dismissed plaintiffs' claims against United.

In re Travel Agent Comm'n Antitrust Litig., 583 F.3d at 902 (emphasis added).

In contrast to the plaintiffs' reliance on rippling effects as a basis for their antitrust claim in In re Travel Agent, here, Plaintiffs allege that Lear engaged in overt acts by selling wire harness systems after it emerged from bankruptcy in November 2009 at supracompetitive prices.  This conduct, thereby giving rise to a new § 1 claim.  The complaints allege that the guilty pleas by other Defendants included admissions that the conspiracies continued "at least" through February 2010.  Based on these admissions, an inference arises that Lear had ample time and opportunity to conspire post-

9

discharge.  Further, Plaintiffs do not allege that Lear's conduct was merely a reaffirmation of an initial agreement.  They do not allege that the final act to effectuate the conspiracy occurred before the discharge.  They allege that each sale was an overt act "pursuant to and as part of its participation in furtherance of the conspiracy."  These allegations distinguish the conduct at issue here from that challenged in In re Travel Agent.  Because a defendant does not pay a zero percent commission–its continuation of the policy involved no overt act, but merely "reflect[ed] or implement[ed] a prior refusal to deal."  Garelick v. Goerlich's, Inc., 323 F.2d 854, 856 (6th Cir. 1963).  In contrast to United Airlines continued policy of zero percent commission which involved no overt act, in the case before this Court, each time Lear charged for a sale it committed an overt act.  See Klehr v. A.O. Smith Corp., 521 U.S. 179, 189-90 (1997) (observing that each sale made pursuant to a price-fixing conspiracy is an overt act that is part of the violation).

Each sale after November 2009 allegedly involved an unlawfully inflated price, so conduct by Lear after bankruptcy confirmation may fall within the ambit of the conspiracy.  If Plaintiffs succeed in proving these allegations, Lear's conduct post-bankruptcy cannot be protected by the discharge.  Therefore, the Court denies Lear's request for dismissal.

## IV. CONCLUSION

For the reasons discussed above, the Court **DENIES** the motion.

10

**IT IS SO ORDERED**

s/Marianne O. Battani
MARIANNE O. BATTANI
UNITED STATES DISTRICT JUDGE

Date: June 6, 2013

CERTIFICATE OF SERVICE

I hereby certify that on the above date a copy of this Opinion and Order was served upon all parties of record via the Court's ECF Filing System.

s/Bernadette M. Thebolt
Case Manager
